

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6113 | **DATE** | 12/11/2002 |
| **CASE TITLE** | U.S.A. ex rel Lee D. Curtis vs. Kenneth Briley | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: We deny the Section 2254 for a writ of habeas corpus [1-1] brought by petition Lee Curtis. This is a final and appealable order. This case is terminated.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | |
|---|---|---|---|---|---|---|
| | No notices required. | | number of notices | | Document Number | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | DEC 17 2002 | | | |
| ✓ | Docketing to mail notices. | | date docketed | | 32 | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | | | |
| TSA | courtroom deputy's initials | 02 DEC 16 PM 12: 26 | date mailed notice | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. LEE D. CURTIS | ) ) ) | |
| Petitioner, | ) ) | No. 00 C 6113 |
| v. | ) ) | |
| KENNETH BRILEY, | ) ) | Wayne R. Andersen District Judge |
| Respondent. | ) ) | |

**DOCKETED**

DEC 1 7 2002

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the petition of Lee D. Curtis for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. For the following reasons, we deny the petition for habeas corpus.

### BACKGROUND

Curtis does not challenge the statement of facts set forth in the order of the Illinois

Appellate Court affirming his first degree murder conviction. *See People v. Curtis*, Nos. 1-95-

3563 and 1-97-0639 (consolidated) (Ill. App. Ct. Feb. 26, 1999). For purposes of federal habeas

review, "a determination of a factual issue made by a State court shall be presumed to be

correct." 28 U.S.C. § 2254(e). Accordingly, we will adopt the facts as our own.

At trial, Chicago Detective Thomas Ptak testified that, on April 7, 1993, he was

investigating a series of arrow shootings in the vicinity of Cicero Avenue and Madison Street in

Chicago, including the murder of Olivia Dawson. These incidents generally involved short bolts,

which would be fired by a crossbow. As it turned out, Dawson had been shot with a longer bolt,

measuring between 20 and 22 inches. Detective Ptak believed that the longer bolt had also been



fired by a crossbow due to the "knock," or flat metal backing, of the bolt. Detective Ptak stated that two black 11-inch bolts, with yellow tips and practice tips, were recovered in one of the shootings.

Detective Ptak also stated that he learned of two similar arrow shootings in Harvey, Illinois. The victims were identified as Carla Kye and a Miss McInroy (later referred to at trial as McElroy). Detective Ptak spoke to the Harvey police and read their reports. Detective Ptak recovered a bolt from the McInroy shooting, which was similar to bolts he had recovered in Chicago.

Detective Ptak also testified that Katrina Davis, who was shot with an arrow days prior to the Dawson killing, and Kena Simmons, who was struck in the head with a beer bottle in the same area that evening, were interviewed regarding their attacks. Both women identified their attacker as a light complected male black with a receding hairline and some facial hair, approximately 30 years of age, standing 5 feet 9 inches, weighing approximately 200 pounds, and wearing eyeglasses and dark blue clothing. Davis described the vehicle involved in the shooting as a smaller light blue car; Simmons described the vehicle as a blue two-door Buick Regal, with a license plate that began with "V" and included an "R" or "X".

Detective Ptak later went to a store called Freddie Bear Sports at 172nd and Oak Park, which the record suggests is located in Tinley Park, Illinois. Detective Ptak brought photographs, the bolts from Harvey and the shaft used in the Dawson homicide. He showed store owner Fred Lutger the evidence, which Lutger identified as hunting items he sold in his store. Lutger told Detective Ptak that the bolts were discontinued and that he had bought the entire stock from the distributor five years earlier. Lutger indicated that he had not sold many of

2

these older bolts because they were solid core, as opposed to the lighter, faster hollow core bolts sold today. However, Lutger stated that he sold 40 Barnett bolts to one individual on or about March 7, 1993.

According to Detective Ptak, Lutger described the customer as a light complected male black, with a receding hairline, standing 5 feet 9 inches, weighing approximately 200 pounds, wearing glasses, and usually wearing light blue coveralls. Lutger told Detective Ptak that he also sold broadhead arrowheads to the customer he had just described. Lutger said this customer would come in with a woman, Odessa Miller, and use her firearms card to purchase weapons. Detective Ptak stated that a store clerk named Hank Beyer showed him records for a gun purchased attributed to Miller. Beyer further indicated that he sold Miller's boyfriend, later identified as the petitioner, a crossbow at an exhibition show in Dolton, Illinois on March 12, 1993.

After receiving this information, Detective Ptak went to Odessa Miller's house in Markham, Illinois. He saw no one present at the house, but he did notice an archery target in the backyard and several arrowheads, just above the target, stuck in a tree. He returned to the Markham police station where he spoke with Illinois State Police Officer Jill Riggs. Officer Riggs showed Detective Ptak a file on the person she described as living at the Miller home, which included a photograph of the petitioner. Officer Riggs also provided a description of Curtis which was similar to that provided earlier by Davis and Simmons. An arrest report in the file stated that Curtis had been driving a 1979 Buick with license plate number ZST607.

After collecting this information, Detective Ptak next drove to Harvey, looking for Curtis at his place of employment. While in Harvey, he received a message that the petitioner had been

3

picked up in Markham and brought into the police station there. While on the way to the station, Detective Ptak drove past the Miller house again, and this time he noticed a bright blue 1979 Buick Regal in the driveway with license plate number VUR842. Odessa Miller came out of her house while Detective Ptak was examining the car. He asked whether he could look inside the car. Miller replied that the car did not belong to her nor did she have keys to the car. Detective Ptak testified that the police asked Miller whether Curtis kept a crossbow in the house. After questioning Detective Ptak about her potential involvement in the investigation, Miller went into the house and returned with a crossbow in her hand.

Detective Ptak returned to the Markham police station where he spoke with Curtis, who had been read his *Miranda* rights. After Detective Ptak showed him the crossbow and stated that he obtained it from Odessa Miller, Curtis consented to the police retrieving a compound bow, bolts, arrows, and arrowheads from the Miller house. Detective Ptak then returned to the Miller house where he collected the aforesaid archery items. Shortly thereafter, Curtis was charged with the first degree murder of Olivia Dawson.

Before the jury was impaneled, Curtis filed a motion to quash his arrest and to suppress the evidence collected at the Miller home. Specifically, he argued that the police did not have probable cause to arrest him and that Detective Ptak offered false or perjurious testimony during the preliminary hearing. Although both the trial court and the Illinois Appellate Court recognized certain inconsistencies in Ptak's testimony, the trial court nonetheless concluded (and the Appellate Court agreed) that, based on the substantial amount of evidence collected in this case apart from that recovered from the Miller house, there was probable cause to arrest the petitioner.

4

At trial, the State called many eyewitnesses to the stand against Curtis. Many of these witnesses were prostitutes from the west side of Chicago who testified that they had repeatedly seen Curtis lurking around the area where Dawson was murdered. Vicki Brown, a former prostitute, testified that shortly after 4 a.m. on April 1, 1993, she noticed Dawson on the south side of Madison Street, west of a train viaduct. Brown also noticed the petitioner standing by some trailers in a nearby parking lot. She then saw Curtis easing along the wall of a mattress factory abutting the parking lot, peeking at Dawson. According to Brown, Curtis was holding what appeared to be a black stick with a piece of wire sticking out of the side. When Curtis saw Brown, he apparently ran between some trailers. At that point, Brown warned Dawson that someone was watching her and she left to purchase drugs for herself. When she returned to the area fifteen minutes later, she saw an ambulance and police. Brown did not immediately tell the police what she had seen because she was a cocaine addict at the time. Brown was questioned the next week and she identified the petitioner in a line-up on April 10, 1993. At that time, Brown also identified the crossbow Curtis held on April 1.

Interestingly, Curtis made the decision to represent himself during his trial. He also made the decision to testify on his own behalf. He claimed that he was in bed with Miller the night of the Dawson shooting. He denied buying Horton arrows at the Dolton show; he claimed instead that he purchased the arrows in Indiana on April 2, 1993. Curtis also testified that he could not hunt due to a prior felony conviction. Additionally, he testified that he could not have committed the homicide because he has very poor eyesight and that he did not think he was a good enough archer to hit a moving target.

Following the close of evidence, the jury deliberated and returned a verdict finding the

5

petitioner guilty of first degree murder. Curtis then filed a motion for a new trial and a motion for a new trial based on newly-discovered evidence. Both of these motions were denied. The trial court sentenced Curtis to natural life imprisonment.

## PROCEDURAL HISTORY

On September 12, 1995, several days before he was actually sentenced by the trial court, Curtis filed a *pro se* petition for post-conviction relief in the Circuit Court of Cook County, which he amended on October 16, 1996. In the petition, Curtis claimed that the state knowingly put on false testimony in its case against him and it failed to turn over evidence impeaching a witness against him. He also claimed ineffective assistance of counsel at the hearing on his pre-trial Motion to Quash Arrest and Suppress Evidence. The Circuit Court of Cook County dismissed the post-conviction petition as frivolous and patently without merit.

Curtis appealed his sentence, conviction, and the dismissal of the post-conviction petition to the Illinois Appellate Court raising the following six issues: 1) he was denied the right to an impartial jury by the trial court's refusal to permit him to peremptorily challenge a specific juror after jury selection was completed; 2) he was denied a fair trial because the jury was not polled after it returned the guilty verdict; 3) the trial court erred by failing to suppress two line-up identifications during which he was not given the opportunity to have counsel present; 4) the state made improper closing arguments; 5) the trial court abused its discretion in finding the murder exceptionally brutal and heinous and sentencing him to life imprisonment; and 6) the trial court erred in not appointing counsel to represent him on his petition for post-conviction relief. In a *pro se* supplemental brief to the Appellate Court, the petitioner raised the additional claims that: 1) the police did not have probable cause to arrest him, but presented false evidence to

6

support his arrest in violation of his right to due process; 2) the combined incidents of misconduct at the trial court level deprived him of a fair trial; and 3) the trial court erred by dismissing his post-conviction petition without appointing counsel even though his petition stated a colorable constitutional claim. On February 26, 1999, the Illinois Appellate Court affirmed the conviction, sentence, and dismissal of the post-conviction petition in a consolidated opinion. Curtis then filed a timely petition for leave to appeal to the Illinois Supreme Court in which he claimed that: 1) the appellate court erred in holding there was no plain error at his trial; 2) the combined incidents of misconduct at the trial level deprived him of a fair trial; 3)the appellate court erred in upholding the trial court's denial of his Motion to Quash Arrest and Suppress Evidence; and 4) the appellate court erred in upholding the dismissal of his post-conviction petition. On October 6, 1999, the Illinois Supreme Court denied leave to appeal.

On October 2, 2000, Curtis filed in this Court the instant petition for a writ of habeas corpus. In his petition, he raises four grounds for relief: 1) that the state presented false evidence at trial, thus violating his right to due process; 2) that he did not receive a full and fair hearing on the Motion to Quash Arrest and Suppress Evidence because: a) he was denied effective assistance of counsel; b) the police did not have probable cause to arrest; and c) the state fabricated evidence; 3) that his first post-conviction petition was improperly dismissed without the appointment of counsel; and 4) that a fundamental miscarriage of justice occurred in the state's proceedings against him. We will address each of these claims in turn.

## DISCUSSION

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28

7

U.S.C. § 2245(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997); *see also Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law."). The federal courts may not grant habeas relief under Section 2254 unless the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Before a federal court may review the merits of a habeas petition, a petitioner must: (1) exhaust all remedies available in state courts; and (2) fairly present any federal claims in state court first, or risk procedural default. *See Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default."); *see also Bocian v. Godinez*, 101 F.3d 465, 468 (7th Cir. 1996) (same). "The habeas petitioner must present his federal constitutional claims initially to the state courts in order to give the state 'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *McGowan v. Miller*, 109 F.3d 1168, 1172 (7th Cir. 1997) (quoting *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887 (1995)).

A petitioner has exhausted his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." *Wallace v. Duckworth*, 778 F.2d 1215, 1219 (7th Cir. 1985). In this case, exhaustion is not an issue. Respondent concedes that Curtis has exhausted his state court remedies for purposes of federal habeas review

because he has no further avenues in state court through which to challenge his conviction. We now turn to the issue of procedural default.

## I.    Procedural Default

The procedural default hurdle forbids the federal courts from addressing claims that were not fairly presented to the state court. *Jones v. Washington*, 15 F.3d 671, 675 (7th Cir. 1994). Procedural default occurs either when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent state procedural requirement, *Coleman v. Thompson*, 501 U.S. 722, 729-30, 111 S.Ct. 2546 (1991), or when the petitioner fails to present a claim to the state courts at the time, and in the way required by the state. *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996). In Illinois, a habeas petitioner is required to raise all arguments before the Illinois Supreme Court, even though the Court has discretionary control over its docket. *O'Sullivan v. Boerckel*, 526 U.S. 838, 843, 119 S.Ct. 1728 (1999).

In this case, respondent concedes that the first three counts of Curtis' petition are not procedurally defaulted. However, he argues that the fourth claim, or the miscarriage of justice claim, has been defaulted because he did not present it to either the Illinois Appellate Court or the Illinois Supreme Court for their consideration. We disagree. First, as respondent acknowledges, many of the specific arguments Curtis has raised under the umbrella of "miscarriage of justice" were, in fact, presented to and addressed by the Illinois Appellate Court in its consolidated opinion. Furthermore, these discrete issues were presented in Curtis' petition for leave to appeal to the Illinois Supreme Court.

Additionally, Curtis can overcome the procedural default rule by showing that he falls within the "miscarriage of justice" exception to the cause and prejudice standard. *See generally,*

*Coleman v. Thompson*, 501 U.S. 722, 750-51, 111 S.Ct. 2546 (1991); *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 84-85, 97 S.Ct. 2497 (1977). This exception is limited to those extraordinary cases in which the petitioner is actually innocent of the crime for which he is imprisoned. *Bell v. Pierson*, 267 F.3d 544, 551 (7th Cir. 2001). Therefore, it requires a colorable claim of actual innocence, as opposed to legal innocence, coupled with an allegation of a constitutional claim. *See Sawyer v. Whitley*, 505 U.S. 333, 339-40, 112 S.Ct. 2514 (1992). The miscarriage of justice exception applies only if the petitioner can demonstrate that it is more likely than not that no reasonable jury would have convicted him in the absence of the alleged defect in the state court proceedings. *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851 (1995).

In this case, Curtis has framed his miscarriage of justice claim using the language of the Supreme Court's decision in *Schlup*. Specifically, he has argued that his separate legal arguments cumulatively establish that his conviction was a miscarriage of justice because, if presented with the evidence presented in his briefs, no reasonable jury would have convicted him of first degree murder. Accordingly, we conclude that Curtis has made a *prima facie* showing that his miscarriage of justice claim falls within the "miscarriage of justice" exception to the procedural default rule. Therefore, we will proceed to address all four of the petitioner's claims on the merits.

## II.  Merits of the Claims Properly Presented

Title 28, United States Code, Section 2254(d) governs the consideration of any claim adjudicated by a state court on its merits. Under that statute, we may grant habeas relief only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable

10

application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under subsection (d)(2), habeas relief is possible if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495 (2000), attempted to clarify the applicable standard of review within the meaning of section 2254. The Court noted that the act does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. *Id.* at 385. Recognizing the need for further clarification and direction to lower courts, the Supreme Court concluded that the "[the act] plainly sought to ensure a level of 'deference to the determinations of state courts,' as long as those decisions do not conflict with federal law or apply federal law in an unreasonable way." *Id.* at 376. Additionally, the Supreme Court determined that, in passing the statute, "Congress wished to curb delays, to prevent 'retrials' on federal habeas petitions and to give effect to state convictions to the extent possible under the law. When federal courts are able to fulfill these goals within the bounds of the law, [the statute] instructs them to do so." *Id.* Therefore, this Court is directed to apply a deferential review of the state court decision unless it is determined that the state court violated federal law.

### A.    Was the conviction based on false evidence?

As part of the first claim in his habeas petition, Curtis argues that his due process rights were violated at trial when the state presented false evidence against him. Specifically, the petitioner asserts that the actual crossbow bolt found in Dawson's body was not the same kind of bolt sold at Freddie Bear Sports, where Fred Lutger worked, or found in his home when it was

11

searched by police. In addition, Curtis contends that his conviction was based on false evidence in that the trial court improperly admitted evidence concerning his involvement in other similar crossbow attacks around the time Dawson was murdered.

It is well-established that "a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 (1959). This is especially true when the State does not solicit the false testimony but nonetheless allows it to go uncorrected when it is offered. *Id.* In addition, the principle that the State may not use false testimony to obtain a conviction applies even when the testimony goes only to the credibility of a witness. *Id.* The key, however, is that the prosecution must *knowingly* use false evidence, *see id.*, and the evidence must have been material to the petitioner's conviction. *See Velarde v. United States*, 972 F.2d 826, 830 (7th Cir. 1992).

In this case, the petitioner has offered an invoice which he believes establishes that the bolt used to murder Dawson was not sold at Freddie Bear Sports. To Curtis, this is significant because, if the murder weapon was not sold there, then Lutger, one the state's key witnesses, should not have been permitted to testify before the jury. The invoice in question from the True Flight Arrow Company indicates that the bolts available at Freddie Bear Sports were 180 Easton GameGetter XX78 bolts and not 180 Easton GameGetter 2117 bolts, which was the type of weapon used to kill Dawson. As a factual matter, the True Flight invoice does not carry the day for Curtis. The state elicited testimony during trial that True Flight, in fact, shipped 180 pieces of Easton 2117 bolts to Freddie Bear Sports on February 17, 1993, billing the purchase through a company called Faber Brothers. This evidence established that Freddie Bear Sports had the

homicide bolt at the time the petitioner allegedly purchased it. Furthermore, Lutger testified that

he did have the bolt in stock, and that the homicide arrow "might" have been one he purchased

through Faber Brothers. Aside from speculation and conjecture, Curtis has offered nothing

which convinces this Court that the evidence presented at trial with respect to the availability of

the homicide bolt was false. Curtis raised all of these issues to the jury and he cross-examined

the witnesses at trial regarding whether the Easton 2117 bolts were for sale around the time of the

murder. The jury weighed the credibility of the different witnesses and concluded that Curtis

most likely purchased the murder weapon from Freddie Bear Sports. As this is perhaps the most

significant role of the jury, we will not overturn its verdict based solely on Curtis' rather flimsy

contentions.

From a legal perspective, we note that the Illinois Appellate Court directly addressed the

issue of false evidence in its consolidated opinion. The court stated that:

> the state was entitled to make an argument based on the evidence, which permitted an
> inference that [Curtis] had obtained the arrowheads at issue from either store (Sportmart
> or Freddie Sports). Any questions raised by the testimony . . . were for resolution by the
> jury. Moreover, the source of the arrow shaft or head is not an essential element of proof
> in this case, where the jury heard [Vicki] Brown testify that she saw defendant carrying a
> crossbow near the time and place of the shooting and the arrow was found penetrating
> Dawson.

*Curtis*, slip op. at 25-26. In a habeas proceeding, our duty is to review the state court's

adjudication of the issue to ensure that it was not "contrary to, or involved an unreasonable

application of, clearly established Federal law as determined by the Supreme Court of the United

States." 28 U.S.C. § 2254(d)(1). We conclude that the Illinois Appellate Court's ruling properly

reflected the Supreme Court's false evidence jurisprudence. The court considered the evidence

and determined, as we have, that the issue of whether the homicide bolt was in fact sold by

13

Freddie Bear Sports was a jury question. Furthermore, we agree with the Illinois Appellate Court that, if indeed the invoice at issue was false, that fact was not material to the essential elements of proof to the crime for which Curtis was ultimately convicted.

The second component of Curtis' false evidence claim is that the trial court erred in permitting the introduction of evidence regarding four other crossbow shootings against similar victims in the same neighborhood. Curtis argues that the crossbow bolts used in those attacks were different from the bolt used to kill Dawson. The state courts' consideration of this issue was correct. Three days before the crossbow shootings began, Curtis bought a crossbow and bolts. He purchased crossbow silencers the following day. Two days later, Maritza McElroy was shot with a crossbow. Over the next two weeks, four women were shot with bolts that Curtis had purchased shortly after the McElroy shooting. On March 31, 1993, Jacqueline Johnson was shot at midnight and then Kristina Davis was shot at 6:30 p.m. Olivia Dawson was shot and killed at about 4:30 a.m. on April 1. The evidence also established that Curtis purchased Satellite broadheads to place on his bolts shortly before Dawson was killed. The state proved that Dawson was shot with a bolt bearing a Satellite broadhead. When police later collected Curtis' archery equipment from his bedroom, one of the three newly purchased broadheads was missing.

We are convinced that the state's introduction of this "other crimes" evidence was perfectly reasonable. As the Illinois Appellate Court noted, "the state may introduce evidence of other crimes under the theory of modus operandi where the crimes share substantial similarities that are not common to most offenses. . . ." *Curtis*, slip op. at * 24. In this case, all of the shootings involved the use of a crossbow (certainly not a typical weapon choice), all of the victims were African-American females, most of the victims were prostitutes, and the victims

14

were all shot in same general vicinity. Further, Curtis admitted to police that he was a frequent customer of prostitutes in the neighborhood, that he had treated them roughly on occasion, and that he had little regard for them. Therefore, based on the record before us, we cannot conclude that the state courts' treatment of this evidence was contrary to established United States Supreme Court precedent. The first count of the habeas petition must fail.

## B.     Was Curtis denied effective assistance of counsel?

In the second claim of his habeas petition, Curtis argues that he was denied effective assistance of counsel when his trial lawyer failed to investigate certain aspects of the case that were significant to his Motion to Quash Arrest and Suppress Evidence. Specifically, Curtis asserts that his counsel failed to investigate the facts offered by the state to establish probable cause, including the information collected by the Markham police, the testimony of Detective Ptak regarding both Fred Lutger and Hank Beyer, the clerk at Freddie Bear Sports, as well as the events which occurred after Detective Ptak arrived at Curtis' home. We conclude that Curtis has failed to meet his burden to demonstrate that the state courts rendered a decision that was "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court." 28 U.S.C. § 2254(d)(1).

The standard for reviewing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *Strickland* sets forth a two-prong analysis for determining ineffectiveness of counsel: 1) a showing that counsel's performance was deficient; and 2) a showing that the deficient performance prejudiced the defendant. *Id.* at 678. In order to prevail on his claim of ineffectiveness under the first prong of the *Strickland* test, Curtis must show that his counsel's performance fell below an objective

15

standard of reasonableness. *Id.* In reviewing the challenged conduct, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To satisfy the prejudice prong of the *Strickland* test, Curtis must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Id.* This Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* Rather, "[i]f it is easier to dispose of an ineffective assistance of counsel claim based on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." *Id.*

In this case, Curtis has not met his burden to demonstrate that he was denied effective assistance of counsel regarding his lawyer's alleged failure to investigate. The Illinois Appellate Court's decision regarding this matter reflects ample consideration and appropriate application of the *Strickland* standard. With respect to the claim that trial counsel failed to investigate certain inconsistencies from key witnesses, which possibly could have resulted in a finding that probable cause did not exist, the Illinois Appellate Court concluded that none of the challenged statements was critical to either the trial court's determination of probable cause or the jury's guilty verdict. Moreover, the record shows that, based on the evidence collected from prior crossbow attacks, as well as statements from eyewitnesses, the police had probable cause to arrest Curtis irregardless of Detective Ptak's challenged testimony. *See Curtis*, slip op. at \*18-20, 31. Therefore, the Appellate Court, in essence, determined that Curtis failed to satisfy the prejudice prong of the *Strickland* test because the outcome of the motion hearing would not have been different in light of the overwhelming evidence gathered in the other crossbow shootings.

Likewise, Curtis' attempt to make an ineffectiveness argument in this Court is unsuccessful. He fails to point to any United States Supreme Court precedent that supports his position, nor does he demonstrate that the Illinois Appellate Court failed to properly assess trial counsel's conduct pursuant to *Strickland*. Curtis merely states that he disagrees with the state court's determination. That is not enough to sustain his burden under § 2254(d). Therefore, Curtis' claim of ineffective assistance of counsel must fail.

### C.    Was Curtis' post-conviction petition properly dismissed?

In the third claim of his habeas petition, Curtis argues that the trial court erred in dismissing his post-conviction petition without first appointing counsel. Apparently, Curtis believes he had a right to have counsel appointed for him pursuant to the Illinois Post-Conviction Act, 725 ILCS 5/122-1 *et seq.* We conclude that this claim is not proper for federal habeas corpus relief.

A federal court can grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475 (1991); *Kavanagh v. Berge*, 73 F.3d 733, 735 (7th Cir. 1996). Before a federal court may overturn a conviction resulting from a state trial, it must be proven not that the state's decision is undesirable, erroneous, or even "universally condemned," but that it violated some constitutional right. *Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940 (1982) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, (1973)). A federal court may not issue the writ of habeas corpus on the basis of a perceived error of state law. *Jones v. Thieret*, 846 F.2d 457, 459 (7th Cir. 1988). Therefore, in order to be cognizable and appropriate for habeas review, a claim must describe a violation of federal

constitutional or statutory law. 28 U.S.C. § 2254(d). If the issue raised does not address *federal* law, the habeas claim is not appropriate for review by the Court. *Coleman*, 501 U.S. at 729-30. In this case, the trial court dismissed Curtis' post-conviction petition and dismissed his request to have counsel appointed because it was "frivolous or patently without merit." 725 ILCS 5/122-2/1(a)(2). The appellate court affirmed this ruling based solely on the applicable state law. Therefore, the third claim of the petition is non-cognizable for purposes of federal habeas review.

**D.      Did a miscarriage of justice occur in the prosecution of the petitioner?**

Curtis asserts that a miscarriage of justice occurred in the state's prosecution against him for the following reasons: 1) there was inadequate forensic evidence presented against him; 2) there was not an eyewitness to the crime; 3) the angle of the arrow was inconsistent with testimony elicited at trial; 4) the state used false evidence to obtain his conviction; 5) inconsistencies exist in the testimony of Detective Ptak; 6) the bulk of the state's case rested on evidence of other crimes to show the killer's identity; and 7) inconsistencies exist in the testimony of the victims of the other arrow shootings. For the sake of efficiency, we note that reasons four through seven have already been addressed in detail earlier in this opinion. Therefore, we conclude that they do not establish that Curtis' prosecution and conviction were a miscarriage of justice.

With respect to the first three subclaims listed above, Curtis has argued in his pleadings that he is actually innocent of the crime for which he was convicted. Relief under the doctrine of miscarriage of justice, however, is limited to situations where the *constitutional* violation probably has resulted in a conviction of a person who is actually innocent. *Schlup*, 513 U.S. at 327. To establish actual innocence, Curtis must demonstrate that, in light of new, reliable

18

evidence not presented at trial, it is more likely than not that no reasonable juror would have convicted him. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604 (1998); *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489 (1998); *Schlup*, 513 U.S. at 327-28. Further, "actual innocence" means factual innocence, not mere legal insufficiency. *Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514 (1992), *limited on other grounds by Schlup*, 513 U.S. at 298. The Supreme Court has noted that, "[g]iven the rarity of such evidence, 'in virtually every case, the allegation of actual innocence has been summarily rejected.'" *Calderon*, 523 U.S. at 559.

At the outset, we note that none of the first three subclaims actually allege a violation of a specific constitutional right. Instead, this entire section of his petition seems to be his amateur forensic evaluation of the evidence presented at trial. He contends that he is actually innocent of the crime because there was not an eyewitness who could absolutely connect him to the Dawson murder scene (despite the testimony of Vicki Brown). Further, he argues that a reasonable jury would not have convicted him if they had been presented with his reconstruction of the murder scene and his "analysis" of the trajectory of the homicide bolt. While we commend the time and effort that Curtis has spent preparing his papers in this case, a miscarriage of justice claim is not the appropriate venue in which to re-argue the facts of his case. An actual innocence claim is reserved for those rare cases in which new evidence demonstrates that the petitioner most likely did not commit the crime and, thus, his conviction is a violation of the Constitution. This is not such a case. While Curtis may quibble with specific testimony presented during his trial, there was, nevertheless, overwhelming physical and direct evidence that Curtis did, in fact, shoot and kill Olivia Dawson.

19

## CONCLUSION

For the foregoing reasons, we deny the Section 2254 petition for a writ of habeas corpus brought by petition Lee Curtis. This is a final and appealable order. This case is terminated.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: December 11, 2002